## STATE v. RUSSELL TERRY JOHNSON.

156 N. W. (2d) 218.

February 2, 1968—No. 40,659.

*C. Paul Jones,* State Public Defender, and *John L. Tambornino,* for appellant.

*Douglas M. Head,* Attorney General, *Gerard W. Snell,* Solicitor General, *William B. Randall,* County Attorney, and *Thomas M. Quayle,* Assistant County Attorney, for respondent.

Heard before Knutson, C. J., and Nelson, Murphy, Rogosheske, and Peterson, JJ.

PETERSON, JUSTICE.

Defendant was indicted in Ramsey County on June 1, 1966, for the crime of murder in the first degree. An information charging defendant with murder in the third degree was filed on June 30, 1966, whereupon defendant pleaded guilty to that crime and the indictment was dismissed. Sentence according to law was imposed on August 23, 1966, after presentence investigation. Defendant now appeals from that judgment of conviction.

The relevant record in this case consists of the indictment, information, and a transcript of the interrogation of defendant by court and

counsel when defendant entered his plea of guilty. It is admitted that defendant shot to death one Ronald John Kemp on May 21, 1966, on the premises of a bar in St. Paul known as "Rondale Rec." Defendant apparently had been drinking in the afternoon, but the amount he consumed is not shown. When defendant arrived at the Rondale Rec, decedent was seated in a booth with a girl friend. Defendant asked if he could dance with the girl, whereupon an argument ensued between defendant and decedent. According to defendant, decedent drew a knife, and defendant shot him *five times*. At the time, decedent was 8 or 10 feet in front of defendant, and the exit to the premises was to his rear, although the distance is not shown. After the shooting, defendant left the premises but later turned himself in to the police after leaving his gun with a sister.

Defendant asserts that the charge of third-degree murder was a "settlement" arranged between counsel for the prosecution and the defense, and he concedes that it "may very likely [have been] a provident one from [defendant's] point of view." Nevertheless, defendant contends that he was denied constitutional due process because the court accepted his plea of guilty without adequate inquiry as to defendant's understanding of his rights in two respects: (1) The court erroneously accepted the plea before ascertaining that defendant was aware of his usual constitutional rights as a criminal defendant; and (2) even more important, the court, in view of the apparent "possibility of a successful defense based on intoxication," should have ascertained whether the reduction to manslaughter in the first degree rather than murder in the third degree would have been a more justly appropriate bargain under the circumstances.[1] A corollary contention is the concomitant claim that his defense counsel was inadequate.

---

[1] "The central question," defendant argues, "is whether he intended to effect the death of Mr. Kemp and if so, the quality of that intent." Murder in the first degree is defined by Minn. St. 609.185(1) as causing the death of a human being "with premeditation and with intent to effect the death of such person"; the penalty is life imprisonment. Murder in the third degree is defined by § 609.195 as the causing of the death of another by perpetrating "an act eminently dangerous to others and evincing a depraved mind, regardless of human life," but without intent to effect the death of any

■ The trial court should not accept a defendant's plea of guilty without first ascertaining, on the record, that he understands the nature and the elements of the crime to which he pleads guilty and that he is informed of the fundamental rights of a defendant who elects to plead not guilty and stand trial. It is evident from the following portion of the transcript that defendant was informed concerning his fundamental rights as a defendant before pleading guilty:

"Q.   [By Allan R. Markert, Prosecutor]—Your lawyer is Mr. Roger Lenzmeier and he is in court with you today?

"A.   Yes.

"Q.   And you have counselled with him on several occasions *before appearing in court today?*

"A.   Yes.

"Q.   And you know you have a right to plead not guilty?

"A.   Yes.

"Q.   And that you have a right to be tried by a jury on this matter?

"A.   Yes.

"Q.   Are you satisfied with the services Mr. Lenzmeier has rendered to you?

"A.   Yes.

"Q.   Do you understand the nature of the crime to which you have pled guilty?

"A.   Yes.

"Q.   Have any threats or promises been made to you in an attempt to induce you to enter your plea?

"A.   No.

---

person; the penalty is imprisonment for not more than 25 years. Manslaughter in the first degree is defined by § 609.20(1) as intentionally causing the death of another person "in the heat of passion provoked by such words or acts of another as would provoke a person [of] ordinary self-control under like circumstances"; the penalty is imprisonment for not more than 15 years or the payment of a fine of not more than $15,000, or both. Defendant apparently asserts the possibility of provocation (relevant to manslaughter) or self-defense (relevant to criminal homicide generally) as secondary questions.

"Q. And you have entered this plea of your own free will?

"A. Yes.

\* \* \* \* \*

"Q. [By the court]—Mr. Johnson, *before you entered your plea did you understand* that under our law a person who is charged with a felony or a crime is presumed to be innocent? Did you understand that?

"A. Yes sir.

"Q. Under our law when a person is charged with an offense the law presumes him to be innocent, and such presumption of innocence stays with him until that time is reached, if that time is reached, when the state has produced evidence which satisfies the minds of the people trying the person of his guilt beyond a reasonable doubt. *Did you understand, before you entered your plea,* that under our law you were presumed innocent of this offense?

"A. Yes sir.

"Q. You understood that?

"A. Yes sir.

"Q. Mr. Lenzmeier discussed that with you?

"A. Yes sir.

"Q. And you understand that under our constitution you have a right to have the state prove your guilt of this particular offense beyond a reasonable doubt?

"A. Yes sir.

"Q. *You understood that when you entered your plea?*

"A. Yes sir.

"Q. Has anybody, either the police or the County Attorney or the Public Defender, or anybody at all, made any promises or any threats to you in order to get you to enter a plea of guilty to this offense?

"A. No sir.

"Q. Your plea of guilty, then, was entered knowingly and voluntarily?

"A. Yes sir.

"Q. You entered it of your own free will?

"A. Yes sir." (Italics supplied.)

It is presumed, in the absence of evidence to the contrary, that the

public defender represented the defendant competently and faithfully. It might appear from this record that the court, apparently assuming that a defendant represented by an experienced public defender would be an informed defendant, did not first establish that defendant knew his rights. But even if that were true, the error, under these circumstances, was obviously without prejudice.

■ The principal ground of defendant's appeal, relating to the right of a defendant to be protected from improvident "plea bargaining," raises questions of far-reaching potential. Our disposition of the case, however, does not require a complete consideration of all such questions at this time.

Plea bargaining between competent counsel and with the intelligent acquiescence of the defendant, it may be observed at the outset, is not in conflict with public policy. Both the Advisory Committee on Criminal Trial of the American Bar Association Project on Minimum Standards for Criminal Justice and the President's Commission on Law Enforcement and Administration of Justice have endorsed the propriety of plea discussions and plea agreements as in the interest of the public in the effective administration of criminal justice.[2]

Public policy, however, requires that this prevalent practice [3] be con-

---

[2] See, A. B. A. Project on Minimum Standards for Criminal Justice, Standards Relating to Pleas of Guilty (tentative draft), § 3.1, "Propriety of plea discussion and plea agreements"; President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society, pp. 134 to 136. The latter report, at p. 135, observes: "The negotiated guilty plea serves important functions. As a practical matter, many courts could not sustain the burden of having to try all cases coming before them. The quality of justice in all cases would suffer if overloaded courts were faced with a great increase in the number of trials. * * *

"At the same time the negotiated plea of guilty can be subject to serious abuses. * * *

"Plea negotiations can be conducted fairly and openly, can be consistent with sound law enforcement policy, and can bring a worthwhile flexibility to the disposition of offenders."

[3] The President's Commission on Law Enforcement and Administration of Justice, in Task Force Report: The Courts, p. 9, reports that, typical of experience in other states, 91.7 percent of convictions in trial courts of

trolled by the observance of certain essential conditions. One obvious condition is that the prosecuting attorney may engage in such discussion with the defendant only through counsel, except where defendant does not have counsel because he either is not eligible for counsel or does not desire counsel.[4] A plea of guilty must, of course, be made by the individual defendant himself and in open court.[5] Another important condition, addressed to both court and counsel, is that the criminal charge for which the plea of guilty is bargained in lieu of the more serious charge shall be reasonably related to defendant's conduct[6] in the sense that "the reduction be to a charge which bears some categoric similarity to the original charge."[7] Yet another condition, addressed even more specifically to the trial court and as a standard for the acceptance of *any* plea of guilty, is that "the court should not enter a judgment upon such plea without making such inquiry as may satisfy it that there is a factual basis for the plea."[8]

The ultimate judicial responsibility must be to make reasonably certain that a person innocent of *any* crime has not been improperly induced to plead guilty to a crime.[9] It is likewise a judicial responsibility to pro-

---

general jurisdiction in Minnesota in 1965 were obtained by pleas of guilty, of which a "substantial percentage" are the product of plea negotiations. Precise data on plea bargaining are not available, the Task Force noted, because "[t]he system usually operates in an informal, invisible manner [and there] is ordinarily no formal recognition that the defendant has been offered an inducement to plead guilty" with the result that "there is no judicial review of the propriety of the bargain."

[4] A. B. A. Project on Minimum Standards for Criminal Justice, Standards Relating to Pleas of Guilty (tentative draft), p. 60.

[5] Minn. St. 630.29.

[6] A. B. A. Project on Minimum Standards for Criminal Justice, Standards Relating to Pleas of Guilty (tentative draft), p. 60; President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society, pp. 135 to 136.

[7] A. B. A. Project on Minimum Standards for Criminal Justice, Standards Relating to Pleas of Guilty (tentative draft), p. 68.

[8] Id. p. 30; President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society, p. 136.

[9] The Advisory Committee made the following observation (A. B. A.

tect society against a defendant's being permitted to bargain for a plea excessively lenient for the gravity of the crime apparently in fact committed.[10] Although the court should neither usurp the responsibility of counsel nor participate in the plea bargaining negotiation itself, its proper role of discreet inquiry into the propriety of the settlement submitted for judicial acceptance cannot seriously be doubted.[11]

We are unable to hold, on this record, that the trial court accepted defendant's plea of guilty without factual foundation. The defendant, it

---

Project on Minimum Standards for Criminal Justice, Standards Relating to Pleas of Guilty, p. 62): "Implicit in the standards is the notion that the various objections which have been voiced to plea discussions and agreements can be overcome. It has been said that the 'greatest danger' involved in offering leniency for guilty pleas is that an innocent person might thereby by induced to plead guilty. Comment, 66 Yale L. J. 204, 220 (1956). Because 'there is no such thing as a beneficial sentence for an innocent defendant,' a plea discussion-plea agreement system can be justified 'only if the result is both to produce the needed guilty pleas and to persuade only guilty defendants to plead guilty.' Comment, 32 U. Chi. L. Rev. 167, 176, 181 (1964)."

[10] President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society, p. 136: "The judge's function is to insure the appropriateness of the correctional disposition reached by the parties and to guard against any tendency of the prosecutor to overcharge or to be excessively lenient."

[11] The difficulty of assessing the judge's delicate role in regard to plea bargaining is recognized by the President's Commission on Law Enforcement and Administration of Justice in the following excerpt from The Challenge of Crime in a Free Society, p. 136: "The Commission believes that * * * the agreed disposition should be openly acknowledged and fully presented to the judge for review before the plea is entered.

"Inevitably the judge plays a part in the negotiated guilty plea. His role is a delicate one, for it is important that he carefully examine the agreed disposition, and it is equally important that he not undermine his judicial role by becoming excessively involved in the negotiations themselves. * * *

\* \* \* \* \*

"* * * The judge's role is not that of one of the parties to the negotiation, but that of an independent examiner to verify that the defendant's plea is the result of an intelligent and knowing choice and not based on misapprehension or the product of coercion."

is conceded, is guilty of some degree of criminal homicide and is not an innocent person. Because the alleged intoxication of defendant is the principal point of argument as to the appropriateness of the lesser crime charged, the nature of the testimony before the court on that point should be noted:

"Q. [By Roger R. Lenzmeier, Assistant Public Defender]—You had been drinking that afternoon but you weren't drunk. Is that a fact?

"A. Well, I wasn't real drunk.

"Q. You were feeling a little high?

"A. Yes.

"Q. *You weren't under the influence of liquor to the point where you didn't recall the young man you had met at Rondale and left for a little while?*

"A. Yes.

"Q. *You could realize what you were doing?*

"A. *Yes.*

"Q. And you had no problem in the respect of remembering things that happened there at the Rondale, is that right?

"A. Yes." (Italics supplied.)

The crime of third-degree murder bears a categoric similarity to the original charge of first-degree murder and is reasonably related to defendant's conduct as it appears on this record. There is indication in the record, moreover, that the state's amenability to a plea to this lesser offense was not prompted simply by doubt as to the provability of the originally indicted crime but was prompted as well by a sympathetic concern for a young man who had no prior criminal record.

Affirmed.